UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| TOTAL CONTAINMENT, INC. | : | |
| Debtor | : | Bankruptcy No. 04-13144bf |

_____

| | | |
|---|---|---|
| GEORGE L. MILLER, Chapter 11 trustee | : | |
| Plaintiff | : | |
| v. | : | |
| MARCEL DUTIL, | : | |
| THE CANAM MANAC GROUP, INC., | | |
| CANAM STEEL CORPORATION, | : | |
| FINLOC, INC., | | |
| FINLOC CAPITAL, INC., | : | |
| FINLOC US, INC., | | |
| WINSTON TOWERS 1988, INC., | : | |
| POLYFLOW, INC., | | |
| JAY R. WRIGHT, JR., | : | |
| BERNARD GOUIN, and | | |
| PIERRE DESJARDINS | : | |
| Defendants | : | Adversary No. 05-0145 |

_____

.............................................................

MEMORANDUM

.............................................................

The former chapter 11 trustee, George L. Miller, who is now plan

administrator under the terms of a confirmed plan providing for the liquidation of all

assets of Total Containment, Inc. (TCI), commenced an adversary proceeding asserting

seven counts against 11 defendants, seeking in excess of $23 million in damages along

with declaratory relief.  In his amended complaint, as summarized by the defendants, the

trustee asserted claims: "against all defendants for breach of fiduciary duty related to

TCI's sale of certain assets (First Claim); against all defendants for fraudulent transfer of those same assets (Second Claim); successor liability against Polyflow, Inc. ("PolyFlow") (Third Claim); against the individual defendants for breach of fiduciary duty and negligence related to two judgments issued against TCI (Fourth and Fifth Claims); against all defendants for "deepening the insolvency" of TCI (Sixth Claim); and against all defendants except Canam Group[1] for certain declaratory relief related to the allowance of claims against the bankruptcy estate (Seventh Claim)."  Memorandum of Canam Defendants, at 1.

In light of a prior ruling concerning defendants' motions to dismiss, these counts are now arrayed against the following defendants: Count I—all defendants; Count II—Finloc, Inc., Finloc Capital, Inc., Winston Towers 1988, Inc., and PolyFlow, Inc; Count III—PolyFlow, Inc.; Count IV–Messrs. Dutil, Wright, Gouin, and Desjardins; Count V—Messrs. Dutil, Wright, Gouin, and Desjardins; Count VI—all defendants except Finloc Capital and Winston Towers; and Count VII—all defendants except Canam Group, Inc.[2]

The various defendants have filed two joint motions for summary judgment as concerns Counts I, II, IV-VII.  These motions are opposed by the plaintiff.  The parties have submitted voluminous exhibits, including numerous partial deposition transcripts,

_____

[1]Formerly known as Canam Manac Group, Inc.

[2]At the time of this earlier ruling, only Canam Group had not filed a proof of claim against TCI.  Since then, Canam Group asserted that it became the successor in interest to Canam Steel.  At oral argument, the parties agreed that Count VII now involves Canam Group but not Canam Steel as a defendant.

along with lengthy memoranda in support of their respective positions.  For the reasons

that follow, those motions shall be granted in small part and denied in large part.


I.


Federal Rule of Bankruptcy Procedure 7056 incorporates Fed. R. Civ. P.

56, the summary judgment rule, into bankruptcy adversary proceedings.  Summary

judgment avoids the expense and delay of an unnecessary trial when no material facts are

in dispute and one or more of the parties is entitled to prevail on the merits.  See, e.g.,

Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429

U.S. 1038 (1977).  The standard for determining the applicability of summary judgment

under Rule 56 is well established.  As the Third Circuit Court of Appeals observed:

> Summary judgment is appropriate when the moving party is
> entitled to judgment as a matter of law and there is no genuine
> dispute of material fact. . . .  In order to defeat "a properly
> supported summary judgment motion, the party opposing it
> must present sufficient evidence for a reasonable jury to find
> in its favor."  Groman v. Township of Manalapan, 47 F.3d
> 628, 633 (3d Cir. 1995) (citing Anderson v. Liberty Lobby,
> Inc., 477 U.S. 242, 250-52, 106 S. Ct. 2505, 2511-12, 91 L.
> Ed. 2d 202 (1986)).  In essence, the non-moving party must
> demonstrate a dispute over facts that might affect the outcome
> of the suit.  Id.  Moreover, in reviewing the record, we must
> give the non-moving party the benefit of all reasonable
> inferences. . . .

Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 112 (3d Cir. 1996).

The application of these general principles is affected by the allocation of

the evidentiary burden of persuasion, were the dispute to proceed to trial.  That is, a trial

court's approach to summary judgment is influenced by whether the party seeking

3

summary judgment would have the burden of persuasion at trial.  See generally

Coquellette, et al. 11 Moore's Federal Practice 3d, §§ 56.03[4], 56.13[3] (2006).  This

approach was well summarized in Adams v. Consolidated Rail Corp., 1994 WL 383633,

at *1-*2 (E.D. Pa. 1994):

> The Supreme Court articulated the allocation of burdens
> between a moving and nonmoving party in a motion for
> summary judgment in Celotex Corp. v. Catrett, 477 U.S. 317
> (1986).  The Court held that where the movant is the
> defendant, or the party without the burden of proof on the
> underlying claim, the movant still has the initial burden of
> showing the court the absence of a genuine issue of material
> fact, but that this does not require the movant to support the
> motion with affidavits or other materials that negated the
> opponent's claim.  Id. at 323.  In contrast, where, as here, "the
> party moving for summary judgment is the plaintiff, or the
> party who bears the burden of proof at trial, the standard is
> more stringent."  National State Bank v. Federal Reserve
> Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  To sustain its
> initial burden under such circumstances, the movant must:
>
> > "support its motion with credible evidence . . .
> > that would entitle it to a directed verdict if not
> > controverted at trial.  In other words, the
> > moving party must show that, on all the
> > essential elements of its case on which it bears
> > the burden of proof at trial, no reasonable jury
> > could find for the non-moving party."
>
> Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.
> 1993). . . .  If the movant makes such an affirmative showing,
> it is entitled to summary judgment unless the nonmoving
> party, in response, comes forward with significant, probative
> evidence demonstrating the existence of a triable issue of
> fact[.]

(citations omitted); accord In re White, 243 B.R. 498, 501 n.4 (Bankr. N.D. Ala. 1999).

Thus, "[w]hen, as here, the nonmoving party bears the burden of persuasion

at trial, the moving party may meet its burden on summary judgment by showing that the

nonmoving party's evidence is insufficient to carry that burden.  The nonmoving party

creates a genuine issue of material fact if he provides sufficient evidence to allow a reasonable jury to find for him at trial." Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998).

As noted earlier, in applying the above-mentioned standard for summary judgment, "[the court must] view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); see also Wetzel v. Tucker, 139 F.3d at 383 n.2; Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir.), cert. denied sub nom. Pennsylvania Secretary of Public Welfare v. Idell S., 516 U.S. 813 (1995); Valhal Corp. v. Sullivan Associates, Inc., 44 F.3d 195, 200 (3d Cir. 1995); Goodman v. Mead Johnson & Co., 534 F.2d at 573.  Moreover, the moving party bears the burden of proving that no genuine issue of material fact is in dispute.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  Once the movant has carried its initial burden, however, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Id. at 587 (quoting Fed. R. Civ. P. 56(e)).  As explained by the Third Circuit:

> At the summary judgment stage of proceedings, if the movant —in this case the Defendants—can point to the absence of any factual support for one of [the] essential elements [of the complaint], then the non-movant, bearing the burden of persuasion at trial, must introduce specific facts showing a need for trial, pursuant to Fed. R. Civ. P. 56(e).  See Celotex, 477 U.S. at 322-24, 106 S. Ct. 2548.  If the non-moving party fails to go beyond conclusory allegations in its pleadings and to produce specific facts indicating that there is a genuine issue for trial, summary judgment will be granted in favor of the moving party.

5

<u>Annulli v. Panikkar</u>, 200 F.3d 189, 198-99 (3d Cir. 1999) (overruled on other grounds by

<u>Rotella v. Wood</u>, 528 U.S. 549 (2000)) (citations omitted).


II.


Upon review of the parties' submissions, the following material facts are

not in dispute.


A.


The identity of the parties and their relationships are material to the claims

asserted by the former chapter 11 trustee.  They are outlined as follows:

Total Containment, Inc. (TCI) is a Pennsylvania corporation formed in 1986

to distribute underground piping systems and products used to transport petroleum and

alcohol-based motor vehicle fuels from underground storage tanks to aboveground fuel

dispensers.  Amended Complaint and Answers, ¶ 17; Defendant's Ex. 1, at 18.  It was

located in Oaks, Pennsylvania when it filed a voluntary petition in bankruptcy on March

4, 2004.  Around 1997, TCI began producing its own piping; prior to that date, much of

its piping was obtained from one or more third-party vendors.

George L. Miller was chosen as the chapter 11 trustee by the United States

trustee.  Upon confirmation of a liquidation chapter 11 plan, Mr. Miller became the plan

administrator.  The claims he asserts in this adversary proceeding are among the

remaining unliquidated assets of the estate.

6

Defendant Marcel Dutil was a director of TCI and is a citizen of Canada. He was also the chairman, president, majority shareholder and chief executive officer of defendant Canam Group until 2003. He was also chief executive officer of defendant Canam Steel, president of defendant Winston Towers, and director of defendants Finloc, Inc. and Finloc US. In these various roles, he drew salary solely from Canam Group and from an entity known as Placements CMI. Ex. P-5, at 50-52. Until August 2006, Mr. Dutil, through his family, controlled the stock of Canam Group. In numerous documents, Mr. Dutil is referred to as the primary or major shareholder of TCI. Although this description is imprecise, it does reflect an understanding that he had exercised authority over the corporate shareholders of TCI and in that sense was the controlling TCI shareholder. See Ex. P-19 (Canam Admissions, ¶¶ 11, 14, 17).

Defendant Canam Group is a Canadian corporation that owns 100% of the stock of defendant Canam Steel. It also owns preferred stock in defendant Finloc, Inc. Canam Group is primarily engaged in the design and fabrication of construction projects. See Ex. P-5, at 12.

Defendant Finloc, Inc. is also a Canadian corporation. It owns 40% of the stock of defendant Finloc, US and is the successor in interest to defendant Finloc Capital, Inc., also a Canadian corporation. See Finloc's Answer, ¶ 10; Ex. P-19 (Admission, ¶ 23). At the time of TCI's bankruptcy filing, it owned 16.4% of TCI's common stock.

Defendant Finloc Capital was a Canadian corporation located at the same address as Finloc, Inc. before its merger with that corporation. Any monetary advances made by Finloc Capital to TCI were authorized by Mr. Dutil. Ex. P-5, at 118-19.

7

Defendant Canam Steel is a Delaware corporation that formerly owned all of the preferred stock in the debtor, TCI. That preferred stock was transferred to Finloc US in July 2002. It is a wholly-owned subsidiary of Canam Group. Mr. Dutil's son-in-law is corporate president. Ex. P-5, at 40.

Defendant Finloc US is a Delaware corporation located at the same address as Canam Steel. It owns 100% of the stock of defendant PolyFlow, Inc., and at the time of TCI's bankruptcy filing it owned 71.08% of the debtor's common stock.

Defendant Winston Towers is a Florida corporation that owned 60% of the stock issued by defendant Finloc US. It had no employees and acted through Mr. Dutil or at his direction. Ex. P-5, at 117-18.

Defendant PolyFlow is a Pennsylvania corporation formed in March 2002 and is located at the same location as TCI in Oaks, Pennsylvania. At the time of TCI's bankruptcy filing, the president of PolyFlow was Jay R .Wright, Jr.

Defendant Jay R. Wright, Jr. was the president, chief executive officer and director of TCI. Since July 2002, he has also served as the president of PolyFlow.

Defendant Bernard Gouin was a director of TCI. He was also a vice-president of Canam Group and vice-president and treasurer of Canam Steel. Ex. P-7, at 5. He has acted as paid consultant for the Canam defendants and Mr. Dutil since August 2001. Id., at 6-8. While Mr. Gouin served as director of TCI, his only compensation was paid by Canam Steel. Exs. P-5, at 258; P-7, at 19-21.

Defendant Pierre Desjardins was a director and chairman of TCI. He has provided consulting services to Canam Group. Canam Steel and/or Finloc, Inc. paid Mr. Gouin for his services as director of TCI so that he could be covered by group health

8

insurance for himself and his family.  Exs. P-5, at 57; P-6, at 15.  (TCI possibly

reimbursed Canam Steel for this compensation.  Ex. P-6, at 16).

B.

Before 1997, TCI purchased much of its pipes from Dayco Products.  After

complaints about problems with TCI's piping systems, TCI sued Dayco for breach of

warranty and breach of contract, while Dayco countersued TCI for breach of contract, all

claims being heard in federal district court.  See Total Containment, Inc. v. Dayco

Products, Inc., 2001 WL 984708 (E.D. Pa. 2001).  After trial, on May 3, 2001, TCI was

awarded $1,325,808 on its contract claim and obtained no award on its warranty claim;

Dayco was awarded $3,715,170 on its counterclaim.  Id.  Those awards were affirmed on

appeal.  See Total Containment, Inc. v. Dayco Products, Inc., 43 Fed. Appx. 511 (3d Cir.

2002).  TCI never satisfied the Dayco judgment against it.  Nor is there evidence that

Dayco executed upon its judgment.

Around 1997, in light of its dispute with Dayco, TCI began to manufacture

its own primary piping.[3]  The funds to construct and manufacture such piping initially

came, at least in part, from Canam Steel, which obtained preferred stock in return.

During 1997 and 1998, TCI was fairly profitable.  In 1999, TCI signed a promissory note

in the amount of $5 million in favor of Bank of America, the proceeds of which were

---

[3]The district court explained that the piping system used by TCI included a pipe
within a pipe, with the outer pipe containing any leaks, and the inner pipe considered the primary
pipe.

used, at least in part, to repay another commercial lender. That BOA obligation was later increased to a high of $8 million, and still later reduced to about $6.5 million.

By 2001, the year of the Dayco decision, TCI was losing money, reporting as much as $11.9 million in operating losses. In order to keep operating after the adverse Dayco judgment in May 2001, TCI obtained funds from Finloc Capital (now Finloc, Inc.) and Winston Towers beginning around July 2001. Those payments to TCI were approved by Mr. Dutil.

In March 2002, PolyFlow was incorporated as a subsidiary of Finloc US, and the directors of TCI voted to transfer all of TCI's pipe production business to PolyFlow. The asset transfer took place in July 2002, by which PolyFlow paid $3,599,913 in cash to TCI and assumed TCI's $2,550,000 purported debt to Finloc, Inc. To obtain this cash, Finloc Capital transferred $1,965,000 to Finloc US, and Winston Towers transferred to Finloc US $1,785,000, for a total transfer of $3,750,000. Finloc US then purchased 100 shares of PolyFlow stock for $3,750,000 and paid $161,954 to Canam Steel. PolyFlow thereafter paid TCI the aforementioned $3,599,913.

After receiving these funds from PolyFlow, TCI paid $1,753,137.50 to Finloc Capital, $1,783,579.86 to Winston Towers and $53,923 to Finloc, Inc., totaling $3,590,640.36 in distributions. Only about $9,000 of the PolyFlow purchase price was retained by TCI.

After this July 2002 transfer of assets from TCI, which transaction was approved by Mr. Dutil, Ex. P-5, at 194, PolyFlow began production of piping at the same location as TCI, using the same assets, some of the same employees and some of the same management as had been engaged by TCI.

10

After the July 2002 asset transfer, TCI obtained its piping from PolyFlow and continued distributing it to its customers.  TCI continued, however, to suffer operating losses.  There appears to be no dispute that after the July 2002 asset sale and transfer of sale proceeds, TCI's liabilities exceeded its assets. Ex. P-19 (Admissions, ¶¶ 1, 4, 9).  In addition, it is agreed that TCI lent funds to PolyFlow, which funds were not repaid as of the date of TCI's bankruptcy filing in March 2004.  Ex. P-5, at 312-14.

In January 2002, TCI was sued by Murphy Oil in the Philadelphia Court of Common Pleas.  On March 1, 2004, a $4 million judgment was entered against TCI and in favor of Murphy Oil, as a sanction for TCI's failure to comply with various discovery orders.  TCI was also sued by PISCES by OWP, Inc. in federal district court in Ohio in 2002.  When counsel withdrew at TCI's request and TCI did not engage replacement counsel, default judgment was entered against it for $1.3 million.

III.

A.

Upon my review of the parties' submissions, I conclude that the following material facts are in dispute.  This dispute reflects diametrically opposed interpretations regarding the reasons for, and the fairness of, the July 2002 transfers of assets from TCI.

The defendants justify the PolyFlow purchase of TCI assets in the following terms.

11

After 1998, during the period when TCI began manufacturing and using its own piping, the market for its products slowed. As a result, the pipe manufacturing assets were not fully being used. And one of the primary reasons that TCI was unprofitable was due to the overhead costs of maintaining this unused production capacity. To assist TCI, its directors decided to form a new corporate entity that would purchase the pipe production assets and then sell needed pipe to TCI at a lower cost than it had taken TCI to produce it, while beginning a new business of selling piping used in "down-hole drilling." See Ex. P-5, at 155-56. (Presumably, PolyFlow would obtain this lower cost through greater use of the production equipment.) Furthermore, in order to insure that a fair value for the assets was obtained, the pipe production assets were to be sold at a price determined by third-party appraisers and approved by independent corporate directors of TCI.

Consistent with this strategy, two appraisal firms were engaged: one to value the tangible pipe production assets; the other to value the intangible piping assets. The purchase price paid by PolyFlow is essentially the sum of these two appraisals. In addition, the proceeds of the sale were used by TCI to pay outstanding debts with the highest interest rates. Finally, the defendants contend that the July 2002 transfers were approved by the two independent directors of TCI, Messrs. Gouin and Desjardins, and thus fall within their reasoned business judgment.[4]

The result, from the defendants' point of view, was a transaction by which TCI obtained fair value for its assets, repaid its most expensive debt, and no longer had a

---

[4]In July 2002, TCI had only four directors on its board: Messrs. Dutil, Wright, Gouin and Desjardins.

drain on its balance sheet.  The unprofitable pipe production business was simply

"outsourced."  Therefore, the defendants did not breach any fiduciary duties, aid others in

breaching their duties, did not participate in any fraudulent conveyances, did not deepen

TCI's insolvency, nor did they act inequitably to warrant subordination of their claims.

The plaintiff challenges all of the assertions made by the defendants in these

two summary judgment motions, and views the July 2002 transaction as a blatant attempt

to remove a valuable asset from TCI and so be out of the reach of TCI's creditors.

First, the plaintiff proffers evidence that the value of the assets transferred

was actually much higher than the $6 million plus paid.  It refers to an expert report

retroactively valuing the pipe production business assets in 2002 at more than $17

million.  See Exs. P-127, 128.  The plaintiff's expert rejects for a number of reasons the

conclusions of TCI's 2002 appraisals that are relied upon heavily by the defendants.

The plaintiff's expert maintains that the appraisers were not informed of all

the tangible and intangible assets to be transferred.  Ex. P-127, at 2.  Moreover, the

plaintiff's expert report asserts that TCI had developed a valuable technique in

manufacturing its piping; one that TCI management believed would significantly increase

the amount of oil and gas recoverable from older, existing wells.[5]  This pipe production

technique to be applied in down hole drilling was projected by TCI management to have

significant value that was not considered by the two TCI appraisers.

The plaintiff's expert also opines that the pipe production assets were a self-

contained business and should have been appraised on a going-concern, discounted future

---

[5]Plaintiff cites to Ex. P-121, a 2006 PolyFlow business plan document, for a
detailed description of this new pipe production technique referred to as "Thermoflex."

income approach, using 2002 income projections prepared by Mr. Wright.  Ex. P-127, at

3-4.  The two appraisals obtained by TCI in 2002 used a different methodology: the

tangible assets were valued at replacement cost, Ex. P-55, at 9; the intangible assets

(which the appraiser considered to be only the "unpatented technology," Ex. P-8 at 31),

were valued as the present value of royalties that a third-party would pay to use this

technology.  Ex. P-56, at 3.[6]

Second, the plaintiff challenges the defendants' application of

Pennsylvania's business judgment rule.  See generally Cuker v. Mikalauskas, 692 A.2d

1042, 1046 (Pa. 1997).  Initially, the plaintiff contends that to the extent the individual

directors' fiduciary duty was breached, the business judgment rule is inapplicable under

state law.  See 15 Pa. C.S.A. § 1715(a).

In addition, the plaintiff also maintains that the two directors who approved

the PolyFlow transaction, defendants Gouin and Desjardins, were far from independent of

the influence exerted by Mr. Dutil and the Canam defendants.  In support thereof, the

plaintiff observes that Mr. Gouin and Mr. Desjardins were being paid by Canam Steel

and/or Finloc, Inc. and long had connection with Mr. Dutil and his companies, serving as

employees and/or consultants.  See generally Ex. 19 (Request for Admissions, # 24).[7]

_____

[6]To the extent the plaintiff contends that use of replacement value was
inappropriate, Mr. Desjardins may agree.  Ex. P-4, at 81, 8-89.

[7]REQUEST FOR ADMISSION NO. 24:

From August 10, 2001 and continuing through and including Mr.
Miller's appointment as Trustee of TCI, the directors of TCI
included only Dutil and individuals who were employed by or
served as independent contractors to an entity who's [sic] voting

(continued...)

Moreover, from the disputed facts, the plaintiff may be able to prove at trial that Messrs. Gouin and Desjardins did not obtain knowledge of all material facts surrounding the PolyFlow transaction (i.e., the value of the down-hole drilling technology) to warrant application of the business judgment rule.  See generally Keyser v. Commonwealth National Financial Corp., 675 F.Supp. 238, 261 (M.D. Pa. 1987).

Moreover, the plaintiff refers to evidence that there was no negotiation over the July 2002 purchase price, in that Mr. Wright was indirectly involved in the transaction as president of both TCI and PolyFlow, and that TCI made no attempt to obtain competing bids.  Thus, the inference is created that the sales price chosen was favorable to the targeted buyer, PolyFlow, and the transaction intended to defraud existing creditors.

Indeed, the plaintiff refers to documents to support his contention that the July 2002 transaction was structured solely to prevent the potentially valuable pipe production business from the reach of creditors of TCI, such as Dayco.  In corroboration of his position, the plaintiff offers memos reflecting such concerns, including one from Bank of America, TCI's commercial lender.  BOA's approval of the PolyFlow sale was required, and was received.  In December 2002, the lender prepared a "financial statement analysis" of its loan position which stated in part:

> The Bank has approved the sale of certain fixed assets of
> Total Containment, Inc. to a related entity PolyFlow, Inc.  TCI
> has recently developed a special type of pipe which can be
> used to reactivate presently defunct oil wells.  TCI has

---

[7](...continued)
shares were owned and controlled, directly or indirectly, by Dutil.

RESPONSE: Admitted.

decided to spinoff this facet of the business in order to shield
it from potential liability arising from the Dayco lawsuit.

Ex. P-97, at 1-2[8]; <u>see</u> <u>also</u> Ex. P-48.

In addition, the plaintiff points to documents and transcripts revealing that the purported Winston Towers secured debt repaid by TCI, using a significant portion of the purchase price from PolyFlow, involved the back-dating of some loan documents. Exs. P-7, at 125-26; P-10, at 126-27; P-98. The plaintiff infers that this Winston loan was actually an equity contribution (but does not appear to challenge the legitimacy of the secured loan held by Finloc, Inc.). <u>See generally</u> <u>In re Submicron Systems Corp.</u>, 432 F.3d 448. 454-57 (3d Cir. 2006) (analyzing when corporate debt should be recharacterized as equity).

Finally, the plaintiff emphasizes that at the time of the July 2002 transfer, TCI was disclosing in its corporate reports that its liabilities exceeded its assets. This was certainly true after the July 2002 transfers had concluded. Thus, TCI was either insolvent or made insolvent by these transfers.

In other words, if plaintiff's evidence were found credible, and giving him the benefit of all reasonable inferences, he may be able to prove at trial that some or all of the defendants acted in concert to transfer TCI's valuable pipe production assets into a newly formed corporation—at the same location, with the same personnel and dealing

---

[8]This information about TCI's new technology came to the Bank of America employees either from defendants Gouin or Wright. Ex. P-7, at 62-64. Other documents relied upon by the plaintiff in opposing summary judgment were prepared by TCI's former corporate counsel, advising that a transfer of assets to a newly formed corporate entity could, in certain circumstances, give rise to a fraudulent conveyance, breach of fiduciary duty and/or successor liability. <u>See</u>, <u>e.g.</u>, Ex. P-113 (memo dated July 10, 2001 from corporate counsel to Mr. Desjardins).

with the same customers—so that these assets would be outside the reach of TCI's

creditors, such as Dayco.  Thus, they created PolyFlow, an entity controlled by the

Finloc/Canam companies and Mr. Dutil, TCI's so-called primary shareholder.

Furthermore, they structured the transfer to minimize the cash paid to TCI and then paid

out virtually all of those funds to related companies based upon partially challenged debt

obligations owed to companies controlled by its primary shareholder.  See generally In re

Trimble, 479 F.2d 103 (3d Cir. 1973).  And all this occurred while TCI was insolvent or

became insolvent.

          The defendants strongly deny these challenges to the propriety of the July

2002 transactions.  They may fairly argue that Pennsylvania state law permits

shareholders to make loans to a corporation.  See generally In re Erie Drug Co., 416 Pa.

41, 43-44 (1964).  Moreover, I recognize that a retroactive valuation made by plaintiff's

expert based upon projections made by TCI's management of future piping sales may not

be persuasive at trial.  Clearly, however, there are credibility issues that cannot now be

resolved in the context of summary judgment.  Giving the non-moving plaintiff the

benefit of all reasonable inferences, I now conclude that he may persuade a fact-finder

that his interpretation of the motivations and conduct of the defendants is accurate.  If so,

he may prevail under his breach of fiduciary duty claim (with liability extended to those

who knowingly and materially aided and abetted the fiduciaries).[9]  He may also prevail on

--------

[9]I shall not repeat my prior analyses of the state law standard for the establishment
of fiduciary duties by corporate directors, officers and in certain instances, corporate
shareholders; nor shall I repeat my earlier discussion of accomplice liability for such a breach of
duty.  See generally Pierce v. Rosetta Corp., 1992 WL 165817, at *8 (E.D. Pa. 1992).  I do
recognize that Pennsylvania's Supreme Court has not expressly affirmed that a non-fiduciary
(continued...)

his fraudulent conveyance claim under state law, as incorporated by section 544.[10]  (In so

doing, I have no present need to endorse his measure of damages.)

Therefore, defendants' joint requests for summary judgment as to Counts I

and II shall be denied.[11]

_____

[9](...continued)
may be liable for aiding and abetting a breach of fiduciary duty, and that some courts have
predicted that such liability does not exist under state law.  See, e.g., In re Student Finance Corp.,
335 B.R. 539, 551 (D. Del. 2005).  Contra Adena, Inc. v. Cohn, 162 F. Supp. 2d 351 (E.D. Pa.
2001).

[10]Section 544 of the Bankruptcy Code allows the plaintiff to asset a claim using
Pennsylvania's Uniform Fraudulent Transfer Act ("PUFTA").  This state law provides that a
"transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor
made the transfer: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and
the debtor was insolvent at the time of the transfer or became insolvent as a result of it."  12 Pa.
C.S.A. § 5104.  The elements of a fraudulent transfer and the relief permitted are delineated in
the statute.

[11]Although not raised by any of the defendants, I have also considered whether the
former trustee has standing to assert a breach of fiduciary duty claim if TCI was insolvent prior to
the PolyFlow transaction.  Questions of standing, if they exist, must be considered sua sponte, as
they are akin to subject matter jurisdiction.  See, e.g., National Ass'n for Advancement of
Multijurisdiction Practice v. Gonzales, 211 Fed. Appx. 91, 94 n.3 (3d Cir. 2006); In re Weaver,
632 F.2d 461, 462 n.6 (5th Cir. 1980); see generally FW/PBS, Inc. v. City of Dallas, 493 U.S.
215 (1990).
        In order for a bankruptcy trustee to have standing to raise a claim of breach of
fiduciary duty, it must be a claim that belonged to TCI's estate at the time it filed its bankruptcy
petition.  See generally Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown,
Inc., 296 F.3d 164, 169 (3d Cir. 2002).  This requires that the claim not be specific to or held by
individual creditors.  Id., at 170; In re Educators Group Health Trust, 25 F.3d 1281, 1284 (5th
Cir. 1994).
        Pennsylvania common law imposes a fiduciary duty upon corporate officers in
favor of creditors, as well as to the corporation, when the corporation is insolvent.  See, e.g.,
Heaney v. Riddle, 343 Pa. 453, 456 (1942); Voest-Alpine Trading USA v. Vantage Steel Corp.,
919 F.2d 206, 209 & 217 n. 25 (3d Cir. 1990); Brown v. Presbyterian Ministers Fund, 484 F.2d
998, 1005 (3d Cir. 1973).  It is accepted, however, that the trustee of the insolvent corporation
has standing to bring an action under Pennsylvania law for breach of fiduciary duty when
corporate assets are wrongfully dissipated.  See, e.g., Branch v. Kaiser, 291 Pa. 543 (1928);
Brown v. Presbyterian Ministers Fund, 484 F.2d at 1005; In re Insulfoams, Inc., 184 B.R. 694,

(continued...)

B.

I reach a similar conclusion as to Counts VI and VII.

In Count VI, the plaintiff has raised the tort of "deepening insolvency" against certain defendants. Although this tort has not been accepted in all jurisdictions, see, e.g., Trenwick America Litigation Trust v. Ernst & Young, L.L.P., 906 A.2d 168 Del. Ch. 2006), aff'd, 931 A.2d 438 (Del. 2007) (Table), the Third Circuit Court of Appeals has predicted that Pennsylvania's Supreme Court will recognize it. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349 (3d Cir. 2001) ("[W]e conclude that, if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury.").

The Lafferty court, in analyzing this state law tort, defines deepening insolvency as an injury resulting "from the fraudulent expansion of corporate debt and prolongation of corporate life." Id., at 347. See, e.g., In re CITX Corp., Inc., 2005 WL

---

[11](...continued)
703-04 (Bankr. W.D. Pa. 1995), aff'd sub nom., Donaldson v. Bernstein, 104 F.3d 547, 554 n.2 (3d Cir. 1997); see generally Pepper v. Litton, 308 U.S. 295, 307 (1939):

> While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders.

(footnotes omitted).
        Thus, I conclude that the plaintiff has standing to raise his breach of fiduciary duty claim in Count I.

1388963, at *10 (E.D. Pa. 2005) ("[F]raudulent and concealed incurrence of debt can

damage the value of corporate property by allowing an otherwise insolvent corporation to

continue to incur debt, resulting in eventual bankruptcy."), aff'd, 448 F.3d 672 (3d Cir.

2006); Corporate Aviation Concepts, Inc. v. Multi-Service Aviation Corp., 2004 WL

1900001, at *4 (E.D. Pa. 2004) ("As articulated by the Third Circuit, deepening

insolvency involves 'prolonging an insolvent corporation's life through [b]ad debt.'")

(quoting Lafferty at 350); In re Adelphia Communications Corp., 324 B.R. 492, 500

(Bankr. S.D.N.Y. 2005) ("[T]o be held liable for deepening insolvency, a party must have

been able to foresee that the debtor was being operated for an improper purpose."); In re

Global Service Group, LLC, 316 B.R. 451, 456 (Bankr. S.D.N.Y. 2004) (Deepening

insolvency is defined as the "'fraudulent prolongation of a corporation's life beyond

insolvency,' resulting in damage to the corporation caused by increased debt.") (quoting

Schacht v. Brown, 711 F.2d 1343, 1350 (7th Cir. 1983)).  Liability for this tort must be

grounded upon fraudulent rather than negligent conduct.  In re CITX Corp., Inc., 448

F.3d 672, 681 (3d Cir. 2006).  Moreover, when an independent cause of action establishes

a remedy for decrease in assets or lost profits, an additional recovery for deepening

insolvency may not lie.  Id., at 678.

   Here, the plaintiff identifies evidence he intends to offer at trial which,

giving him the benefit of the doubt, could lead a fact-finder to conclude that TCI was not

dissolved after the July 2002 transfers in order to reduce the possibility that TCI creditors

(particularly Dayco) would investigate the PolyFlow transaction and challenge it as

fraudulent.  Furthermore, although TCI was left as a going concern, it had no ability to

pay its creditors—as no loans or capital infusion were forthcoming and its operating

20

expenses exceeded revenues—and so its liabilities increased allegedly by roughly $2 million between July 2002 and March 2004 when a voluntary petition in bankruptcy was filed.

The defendants seek summary judgment as to Count VI primarily relying upon the affirmative defense of in pari delicto. The Third Circuit court describes this doctrine as barring the plaintiff from asserting "a claim against a defendant if the plaintiff bears fault for the claim." Lafferty, 267 F.3d at 354; see In re Dublin Securities, Inc., 133 F.3d 377, 380 (6th Cir. 1997) ("[N]o Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.") (internal quotation marks omitted).

The doctrine of in pari delicto will only apply as a defense to the deepening insolvency claim if the debtor corporation committed some wrongdoing. The wrongful conduct of the individual corporate officers and directors can be imputed to the corporation only if the conduct were committed (1) "in the course of [the officer or director's] employment, and (2) for the benefit of the corporation." Lafferty at 358-59. Thus, the wrongful conduct of a defendant will not be imputed to the corporation if the action was not for the benefit of the corporation. This "adverse interest exception" thus applies where actions taken were adverse to the corporation and not for its benefit. Id., at 359; In re the Personal and Business Insurance Agency, 334 F.3d 239, 243 (3d Cir. 2003).

As noted earlier, there are numerous disputed factual issues surrounding the July 2002 transactions. Although the defendants posit that these transfers were undertaken solely for the benefit of TCI, the plaintiff strongly disagrees. He refers to evidence he would offer at trial that, if believed, suggests that the July 2002 transfers

21

were structured solely to benefit the defendants and were designed to harm the debtor

corporation.  If so proven, defendants' affirmative defense will be unavailing.

As for Count VII, equitable subordination under section 510(c) requires at

least three elements:

> (1) the claimant must have engaged in some type of
> inequitable conduct, (2) the misconduct must have resulted in
> injury to the creditors or conferred an unfair advantage on the
> claimant, and (3) equitable subordination of the claim must
> not be inconsistent with the provisions of the bankruptcy
> code.

Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,

160 F.3d 982, 986-87 (3d Cir. 1998).  Furthermore, relief under section 510(c) should be

tailored to offset the harm caused by the inequitable conduct.  In re Submicron Systems

Corp., 432 F.3d at 462.

For reasons just stated, if the plaintiff's proffered evidence is credible and

persuasive, he may be able to prove all of the elements for relief under section 510(c) as

to some or all of the defendants who have asserted claims against TCI.  The extent of that

relief need not now be considered.  Thus, summary judgment as to Counts VI and VII are

not warranted.

IV.

Counts IV and V concern litigation brought against TCI that was resolved

long after July 2002.

22

Shortly before TCI's bankruptcy filing, two default judgments were entered against it.  One, for $4 million, was entered on March 1, 2004, in favor of Murphy Oil USA, Inc., as a discovery sanction due to TCI's failure to comply with court orders directing discovery responses.  The other, for about $1.3 million, was entered on January 9, 2004, in favor of PISCES by OPW, Inc., and was entered after TCI voluntarily dismissed its litigation counsel and then did not engage new trial counsel, despite being afforded opportunity to do so.

The plaintiff asserts that the four director defendants were guilty of breach of fiduciary duty and negligence in permitting these two judgments to be entered.  The individual defendants argue, in seeking summary judgment, that TCI had no funds with which to litigate these two lawsuits, as it is undisputed that TCI was losing money in 2003 and 2004, and purportedly had no ability to borrow funds from commercial lenders.[12]

In opposing summary judgment, the plaintiff proposes to offer at trial evidence that TCI had available funds with which to defend these two lawsuits.  He emphasizes that in 2003 TCI advanced at least $450,000 to PolyFlow, and that PolyFlow owed TCI about $900,000 in total advances, plus $400,000 in outstanding receivables in March 2004.  See Ex. P-10.  Moreover, he intends to offer evidence from Mr. Wright that he was under instruction to delay all litigation either with the hope that the plaintiffs would settle cheaply, or that TCI would simply cease to operate leaving these two plaintiffs with no assets against which to execute.

---

[12]As TCI was borrowing from Bank of America based upon a guarantee provided by Canam Steel, it is unclear from this record whether—with Canam Steel's approval and guarantee—the bank would not have advanced additional funds to TCI in early 2004.

23

Mr. Dutil justified TCI's conduct regarding PolyFlow loans from TCI and the outstanding PolyFlow debt to TCI by noting that TCI was in default on its loan from Bank of America and was concerned that the commercial lender would execute upon funds held by TCI. He asserts that any TCI funds not forwarded or retained by PolyFlow would have involuntarily been used to repay the bank. Clearly, this raises a factual dispute regarding TCI's ability to fund the litigation, and whether TCI's directors intentionally or negligently wrongfully failed to act.

However, TCI was only damaged to the extent litigation would likely have resulted in liability less than the amount of the default judgments, offset by the estimated costs of litigation to TCI. See generally Honeywell, Inc. v. American Standards Testing Bureau, Inc., 851 F.2d 652, 655 (3d Cir. 1988), cert. denied, 488 U.S. 1010 (1989).

In support of his claim involving the Murphy Oil judgment, the plaintiff intends to offer at trial evidence that Murphy Oil would have settled its lawsuit for $120,000. Exs. P-9, at 18-25; P-16, at 49-50. The plaintiff intends to offer no expert testimony or other evidence concerning the value of this litigation claim against TCI. The defendants counter that Murphy Oil's trial counsel denies ever making such a settlement offer. Ex. P-9 at 38-40. They expect to prove that Mr. Wright's belief that such an offer was made was erroneous, as he was not present during settlement discussions. See Ex. P-19 (Admission, ¶ 59).

Insofar as Counts IV and V involve the Murphy Oil claim, I will deny summary judgment, but limit the disputed evidence offered at trial to whether Murphy Oil made a settlement offer that was wrongfully rejected by TCI's board of directors, acting through one or more of its members. In opposition to summary judgment, the plaintiff

24

offers no evidence on the merits of the underlying litigation and the standard of care.  See,
e.g., Gans v. Mundy, 762 F.2d 338 (3d Cir.), cert. denied, 474 U.S. 1010 (1985); see also
Honeywell, Inc. v. American Standards Testing Bureau, Inc.  He only refers to evidence
that, if credible, may prove the wrongful rejection of a purported settlement offer.  See
Schmidt v. Currie, 217 Fed. Appx. 153, 155 (3d Cir. 2007).  The plaintiff, however, refers
to no evidence that he would proffer at trial to demonstrate that TCI suffered any
damages from the PISCES default judgment, other than a conclusory statement by Mr.
Wright that he considered PISCES' claim—which was based upon a contract, viz., a
breach of a settlement agreement—as without merit.  Ex. P-16, at 92.  This lay conclusion
by itself would be insufficient to meet the plaintiff's burden at trial.  See Honeywell, Inc.
v. American Standards Testing Bureau, Inc.; Gans v. Mundy.  Therefore, summary
judgment in favor of the individual defendants as concerns PISCES and Counts IV and V
is justified.

An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| TOTAL CONTAINMENT, INC. | : | |
| Debtor | : | Bankruptcy No. 04-13144bf |

_____

| | | |
|---|---|---|
| GEORGE L. MILLER, Chapter 11 trustee | : | |
| Plaintiff | : | |
| v. | : | |
| MARCEL DUTIL, | : | |
| THE CANAM MANAC GROUP, INC., | | |
| CANAM STEEL CORPORATION, | : | |
| FINLOC, INC., | | |
| FINLOC CAPITAL, INC., | : | |
| FINLOC US, INC., | | |
| WINSTON TOWERS 1988, INC., | : | |
| POLYFLOW, INC., | | |
| JAY R. WRIGHT, JR., | : | |
| BERNARD GOUIN, and | | |
| PIERRE DESJARDINS | : | |
| Defendants | : | Adversary No. 05-0145 |

_____

................................................................

ORDER

................................................................

AND NOW, this 5th day of March 2008, for the reasons stated in the

accompanying memorandum, it is hereby ordered that the motions for summary judgment

filed by the defendants (as to all counts in the amended complaint except Count III) is

denied in large part.  Summary judgment in favor of the individual defendants is granted

as to Counts IV and V but only as those counts involve the PISCES default judgment.

It is further ordered that on or before April 4, 2008, the parties shall submit a joint pretrial statement consistent with Local Bankr. R. 7016-1.   A final pretrial conference shall take place on April 11, 2008 at 9:30 a.m in Bankruptcy Courtroom #2, at which time the trial dates shall be announced.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Steven M. Coren, Esq.
Kaufman, Coren & Ress, P.C.
1717 Arch Street, Suite 3710
Philadelphia, PA 19103

Jeffrey D. Herschman, Esq.
DLA Piper Rudnic Gray Cary US, LLP
6225 Smith Ave
Baltimore, MD 21290

Christopher W. Wasson, Esq.
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Sts.
Philadelphia, PA 19103

Ms. Barbara Townsend, Courtroom Deputy